UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **333 8TH STREET, NE, LLC, *et al.*,**<br><br>   **Plaintiffs,**<br><br>       v.<br><br>**TURNKEY TITLE, LLC,**<br><br>   **Defendant.** | Civil Action No. 23-941 (JEB) |

### MEMORANDUM OPINION

      This case concerns a real-estate transaction derailed by the intervening crimes of a third party.  Plaintiff J. Michael Hannon owned a property on 8th Street in Washington, D.C., and vested title in an eponymous LLC.  In October 2022, after years of investments, he entered into an agreement to sell it at a profit to another individual.  At the eleventh hour, an unknown fraudster impersonating the seller's agent deceived the buyer's settlement agents into wiring the funds to the wrong bank account and then absconded.  Having lost over half a million dollars, Hannon and his LLC sued the agents' employer, Turnkey Title, for negligence, breach of fiduciary duty, and violations of state consumer-protection laws, requesting both compensatory and punitive damages.  Defendant now moves to dismiss Hannon for lack of standing and the LLC for failure to state a claim and to join a necessary party.

      While the Court agrees that Hannon is not a proper Plaintiff, it believes that the LLC may otherwise proceed.  Defendant's Motion, accordingly, will be granted in part and denied in part.

1

I.      Background

The Court draws the facts from the Amended Complaint (and associated exhibits), as it must at this stage.  Hannon is a Florida resident who operates a law firm in the nation's capital.  See ECF No. 12 (Am. Compl.), ¶¶ 7, 11.  On July 17, 2015, he purchased a property in a residential neighborhood on Capitol Hill — 333 8th Street, Northeast — but titled it in a wholly owned shell company called "333 8th Street, NE, LLC," the second Plaintiff in this matter.  Id., ¶ 9.  He used the property not only as an office for his firm, but also as a part-time abode and an investment asset.  Id., ¶ 11.  Over the years, he expended a quarter-million dollars of his personal funds in maintenance and improvements, hoping to eventually sell it at a higher price and put the proceeds toward his retirement.  Id., ¶¶ 13–14.

In 2022, Hannon decided to sell the property to one John King for $1.15 million.  Id., ¶¶ 15–16.  Plaintiff hired a title company, Legacy Settlement Services, and a real estate agent, Catherine Arnaud-Charbonneau.  Id., ¶¶ 18–19.  King hired Defendant Turnkey Title, LLC — another title company — to assist in wiring proceeds from the transaction to 8th Street's bank.  Id., ¶ 8.  Hannon "executed all documents necessary for the listing, sale and settlement of the sale of the property," and closing took place on October 27, 2022.  Id., ¶¶ 15–16.  But just before the deal crossed the finish line, an unknown fraudster inserted himself into the transaction and deceived Turnkey into wiring an amount of roughly half the property's purchase price to the wrong bank account.  Id., ¶¶ 20, 26–27.  (There is no allegation that King bears any blame.)

The chain of events leading to this debacle began on the morning of closing day.  Turnkey needed to disburse $584,293.62 to 8th Street in connection with the sale.  Id., ¶ 20.  Morgane Barry, a settlement agent from Plaintiffs' title company, notified Turnkey employee Tammy Economes via email that she would be "getting over the sellers['] banking information

for a wire shortly," and Economes thanked her.  See ECF No. 12-1 (Legacy-Turnkey Email Thread) at 19–21.  The fraudster, at this point, intervened in two ways.  First, he responded to Economes from a spoofed email address impersonating Barry and attached fake instructions directing that funds should be wired to Hannon via a Morgan Stanley bank account through Wells Fargo.  See ECF No. 12-4 (Turnkey-Fraudster Email Thread) at 4, 8.  When Economes responded that she required account information for 8th Street (and not Hannon), the fraudster sent new instructions listing 8th Street as the account owner but still providing the same ABA and bank account numbers.  See ECF No. 12-6 (Fraudulent Wire Instructions); Am. Compl., ¶ 29d.  Turnkey, none the wiser, disbursed the funds to that account later that afternoon.  See ECF No. 12-3 (Wire Confirmation).

Second, the fraudster gained access to Economes's Turnkey email account and used it to mislead Plaintiffs' agents.  When the real Barry followed up with the real wiring instructions (which specified a wire to Hannon's Morgan Stanley bank account through Citibank), the fraudster responded from Economes's email account that "[t]here was a delay in disbursement." Legacy-Turnkey Email Thread at 15–17; see also Am. Compl., ¶ 22.  Three days later, on October 31, the fraudster told Barry that she could expect to receive the wired funds and signed closing documents in a matter of hours.  See Legacy-Turnkey Email Thread at 10–14.  The funds, of course, never arrived.  On November 2, Barry informed another of Turnkey's employees that Hannon had not yet received his proceeds and requested a copy of the wire confirmation.  See Legacy-Turnkey Email Thread at 3.  The employee forwarded a wire confirmation showing that the funds were disbursed to the wrong account.  See Am. Compl., ¶ 26.

Upon further investigation, the parties realized that they had been defrauded. Id., ¶¶ 26, 30. Turnkey later referred the matter to federal law-enforcement authorities. Id., ¶ 30. The funds, no surprise, were promptly transferred out of the fraudster's Wells Fargo account and into another unknown account presumably beyond the reach of law enforcement. Id., ¶ 31. They were never recovered. Id.

Convinced that these events should have been entirely avoidable with reasonable security measures and that the fraudster's emails were riddled with obvious indicia of fraud, Plaintiffs sued Turnkey on April 6, 2023. See ECF No. 1; Am. Compl., ¶¶ 28–31. They allege negligence (Count I); breach of fiduciary duty (Count II); violations of the District of Columbia Consumer Protection Procedures Act (CPPA), D.C. Code § 28-3901 et seq. (Count III); and violations of the Maryland Consumer Protection Act (CPA), Md. Code, Com. Law § 13-301 et seq. (Count IV). Id., ¶¶ 32–62. In addition to monetary compensation for the loss of $584,293.62, Plaintiffs seek punitive damages. Id., ¶ 36. Turnkey has now moved to dismiss. See ECF No. 13 (Def. MTD).

**II.     Legal Standard**

A complaint must be dismissed if the court lacks subject-matter jurisdiction. See Fed. R. Civ. P. 12(b)(1). In general, courts must first address jurisdictional arguments before turning to the merits. See Sinochem Int'l Co. v. Malaysia Int'l Shipping Co., 549 U.S. 422, 430–31 (2007). A plaintiff bears the burden of proving that a court has subject-matter jurisdiction to hear her claims. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000). A court has an "affirmative obligation to

ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of the Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).

Rule 12(b)(6), conversely, provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted." In evaluating a defendant's motion to dismiss, the court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1250 (D.C. Cir. 2005). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

Federal Rule of Civil Procedure 12(b)(7) also outlines a standard for dismissal for "failure to join a [necessary] party under Rule 19." The burden is on the defendant to show that joinder is required, see Citadel Inv. Grp., LLC v. Citadel Cap. Co., 699 F. Supp. 2d 303, 317 (D.D.C. 2010), and courts have generally been reluctant to grant Rule 12(b)(7) motions, finding that "dismissal is warranted only when the defect is serious and cannot be cured." Direct Supply, Inc. v. Specialty Hosp. of Amer., LLC, 878 F. Supp. 2d 13, 23 (D.D.C. 2012) (citation omitted). As with Rule 12(b)(6) motions, a court must accept the allegations contained in the plaintiff's complaint as true for the purpose of the Rule 12(b)(7) inquiry. See 16th & K Hotel, LP v. Commonwealth Land Title Ins. Co., 276 F.R.D. 8, 12 (D.D.C. 2011).

**III.    Analysis**

Defendant offers different rationales for the dismissal of each component of this suit: Hannon lacks standing, the negligence and breach-of-fiduciary-duty claims insufficiently allege proximate cause, and 8th Street does not qualify as a "consumer" for purposes of its CPPA and CPA causes of action. Defendant further seeks dismissal of the action for failure to join a necessary party (the fraudster) and argues that the prayer for punitive damages is unsupported by Plaintiffs' allegations. The Court addresses each argument in turn.

A.  Standing

Turnkey first contends that Hannon (but not 8th Street) lacks standing because he was not a party to the real-estate transaction; title to the property, after all, was in 8th Street's name only. Before addressing this contention, a brief clarification is in order. Although Turnkey quotes the legal standard for constitutional standing under Article III, its argument actually invokes the prudential limitation on third-party standing. See Def. MTD at 5–6. The two are analytically distinct.

Constitutional standing "is a prerequisite to the existence of a 'Case' or 'Controversy,' which is itself a precondition to the exercise of federal judicial power." Attias v. Carefirst, Inc., 865 F.3d 620, 625 (D.C. Cir. 2017) (cleaned up). A plaintiff has standing in this sense when he suffers an "injury in fact" that is "fairly traceable" to the defendant's conduct and is "likely to be redressed" by a judicial decision in his favor. Id. (quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016)). Prudential standing, by contrast, is "a more complex, judge-made concept of standing, encompassing a variety of legal doctrines, including the requirement in Federal Rule of Civil Procedure 17 that the plaintiff be the 'real party in interest.'" Giron v. Zeytuna, Inc., 597 F. Supp. 3d 29, 42 (D.D.C. 2022) (internal quotation marks omitted). The prudential inquiry asks

not whether a plaintiff has a tangible stake in the action, but whether he is a "proper proponent[] of the particular legal rights on which [he] base[s] [his] suit." Id. at 41 (quoting Singleton v. Wulff, 428 U.S. 106, 112 (1976)).

Hannon certainly has constitutional standing. A plaintiff need not own the property at issue to suffer a concrete injury in connection with its use or disposition. See, e.g., Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 262–63 (1977) (holding that nonprofit developer had standing to challenge municipality's denial of rezoning request, though it did not own the parcel in question). The indirect injury to Hannon's financial interest will suffice, as he is the sole member of 8th Street, which lost over $584,000 in proceeds to fraud. See Shaw v. Marriott Int'l, Inc., 605 F.3d 1039, 1042 (D.C. Cir. 2010) ("[E]conomic loss clearly constitutes a distinct and palpable injury.") (citation omitted); Potter v. Cozen & O'Connor, 46 F.4th 148, 157 (3d Cir. 2022) (holding that "diminution of value in [LLCs' shareholders] ownership interests . . . meets all the requirements of Article III standing").

Hannon nonetheless lacks standing in the prudential sense to assert claims properly belonging to his LLC. Here, D.C. law regarding corporations is relevant since it informs whether he is the proper party. Because a "corporation is regarded as an entity separate and distinct from its shareholders[,] . . . corporate property is vested in the corporation itself and not the stockholders." Est. of Raleigh v. Mitchell, 947 A.2d 464, 469 (D.C. 2008) (citation omitted). "Even if stock ownership is concentrated in the hands of one person, it does not alter the fact that title to the corporate property is vested in the corporation and not in the owner of its stock." Id. (citation omitted). The same rules apply to limited-liability companies. See Martin v. Santorini Cap., LLC, 236 A.3d 386, 394 (D.C. 2020). Except in limited circumstances, therefore, LLC members may not initiate actions to enforce the rights of the LLC. Id.

A member may still sue, however, if she has a "direct, personal interest in the cause of action[,] . . . even if the [LLC's] rights are also implicated." Harpole Architects, P.C. v. Barlow, 668 F. Supp. 2d 68, 76 (D.D.C. 2009) (internal quotation marks omitted). The test is whether the member has suffered a "'special injury' that does not derive from the injury to the [LLC]." Id. at 77. Such injury may arise under two conditions: (1) "the allegedly wrongful conduct violates a duty to the complaining [member] independent of the fiduciary duties owed that party along with all other [members], such as a duty that arises out of an employment relationship"; and (2) "the conduct causes an injury to the [members] distinct from any injury to the [LLC] itself, such as losses resulting from a company wrongfully withholding dividends." Labovitz v. Wash. Times Corp., 172 F.3d 897, 901 (D.C. Cir. 1999) (internal quotation marks omitted).

Hannon's claims satisfy neither of these conditions. First, he does not explicitly allege that Turnkey and its employees owed a duty to him independent of their duties to 8th Street. The Complaint, as to all four counts, does not distinguish between Plaintiffs: It alleges that Turnkey "owed a duty of reasonable care to Plaintiffs with respect to the handling of settlement proceeds," had a "duty to protect [] Plaintiffs' financial information and assets," and misled "Plaintiffs regarding the security of Plaintiffs' personal information." Am. Compl., ¶¶ 33, 38, 47, 57 (emphases added). Hannon asserts, in fact, that 8th Street is his "alter ego," id., ¶¶ 9, 15, and that they share a "unity of ownership" that presumably allows the Court to impute the duties owed to the company to himself." ECF No. 14 (Pl. Opp.) at 7. The Court does not discern an independent duty to Hannon among these allegations.

Second, even assuming that Hannon has alleged that Turnkey violated an independent duty it owed to him, his alleged injury is no different from 8th Street's. For every count, his requested damages are identical to those sought by the LLC. See Am. Compl., ¶¶ 36, 40, 52, 62.

By contrast, in the only case Hannon cites where a shareholder was deemed to have suffered a "special injury" — Harpole, 668 F. Supp. 2d 68 — the corporation at issue could not have claimed the damages the shareholder sought in its own right. See Pl. Opp. at 7. There, a shareholder, Jerry Harpole, and his wholly owned company, Harpole Architects, P.C., sued their former bookkeeper and administrative assistant for embezzling company funds and using the company's accounts with certain service providers for personal gain. Harpole, 668 F. Supp. 2d at 71–72. The plaintiffs also alleged that Harpole declined a salary for some pay periods because the defendant falsely told him the "firm was short of cash." Id. at 77. The court permitted Harpole's claim for lost wages as a result of fraud and intentional misrepresentation to proceed in his name. Id. at 78. But the other claims were dismissed as derivative of the company's injury. Id. Because Hannon's financial injury is likewise derived from his ownership interest in 8th Street and because he alleges no loss specifically personal to him, such as lost wages, he cannot proceed in his own name.

      As 8th Street is the only proper Plaintiff as to all four counts, Hannon will be dismissed without prejudice for lack of prudential standing. The Court thus need not reach the parties' further dispute over whether he has standing as a "consumer" of Turnkey's services for purposes of Counts III and IV. See Pl. Opp. at 4, 6–7; ECF No. 15 (Def. Reply) at 2.

      B.  Negligence and Breach of Fiduciary Duty

      Defendant next argues that 8th Street's negligence and breach-of-fiduciary-duty claims should be dismissed because it has not adequately pled that Turnkey proximately caused its alleged injuries. More specifically, Defendant points out that the fraudster's criminal act breaks the chain of causation. Under D.C. law, a defendant may not be held liable for the harm caused by the criminal act of a third party unless it was "particularly foreseeable." Workman v. United

9

Methodist Comm. on Relief of Gen. Bd. of Glob. Ministries of United Methodist Church, 320 F.3d 259, 262 (D.C. Cir. 2003). Courts have characterized this heightened foreseeability standard as "'exacting,' 'demanding,' 'precise,' and 'restrictive.'" Sigmund v. Starwood Urb. Inv., 475 F. Supp. 2d 36, 42 (D.D.C. 2007). The standard varies, however, depending on the relationship between the plaintiff and defendant: "[A] relationship entailing a greater duty of protection may require a lesser showing of foreseeability." Harris v. Washington Metro. Area Transit Auth., 490 F. Supp. 3d 295, 308 (D.D.C. 2020) (quoting Bd. of Trs. of Univ. of D.C. v. DiSalvo, 974 A.2d 868, 872 (D.C. 2009)).

Even assuming that the parties do not have a relationship that entails a greater duty of care, 8th Street's allegations are still sufficient at this stage to show that the fraudster's conduct was foreseeable under the heightened standard. On the one hand, "[f]oreseeability cannot be predicated upon 'generic information' such as crime rates or evidence that the defendant's employees worked in a 'criminally active environment.'" Workman, 320 F.3d at 262 (internal citation omitted); see also, e.g., Harris, 490 F. Supp. 3d at 311 (finding "'heightened amount of criminal activity' near the Potomac Avenue Metro Station" insufficient to make fatal stabbing foreseeable); DiSalvo, 974 A.2d at 873 ("previous on-campus crimes" similarly insufficient, where student was stabbed). On the other hand, the plaintiff need not show "previous occurrences of the particular type of harm." Workman, 320 F.3d at 26. All that is required is "a combination of factors which give the defendant an increased awareness of the danger of a particular criminal act." Id. (alterations omitted).

The Complaint suggests that those factors were present. See Am. Compl., ¶¶ 28–29. Most notably, just beneath the signature block on every email from Turnkey's agents was a warning regarding "fraudulent funding instructions." See Legacy-Turnkey Email Thread at 1, 3

5–6, 11, 14, 17, 20.  It states, "Email hacking and fraud are on the rise to fraudulently misdirect funds" and instructs readers to "verify any funding instructions received" by contacting the escrow officer using information from an independent source.  Id.  Emails from Plaintiffs' settlement agents contained a similar warning: "If you receive an email, or any other communication that appears to be generated by our office, containing new, revised, or altered bank wire instructions, consider it suspect and call our office . . . ."  Id. at 21.

In addition, the fraudster gave Defendant many clues something was amiss.  For example, in attempting to impersonate Barry, he utilized an email address (morgane_legacyfortitle@exfec.com) that differed from Barry's (morgane@legacyfortitle.com) in visibly significant ways.  Compare Turnkey-Fraudster Email Thread at 1, 4 with Legacy-Turnkey Email Thread at 20.  That the ABA and bank-account numbers the fraudster provided did not change when he was asked to provide new wiring instructions for 8th Street's account, as opposed to Hannon's, was further evidence of mischief.  The Court must infer at this stage that these factors would increase Turnkey's awareness of precisely the kind of fraud that occurred.

As 8th Street has thus sufficiently alleged proximate cause, its negligence and breach-of-fiduciary-duty claims may proceed.

C.  D.C. CPPA and Maryland CPA

As to the remaining causes of action under the D.C. CPPA and Maryland CPA, Turnkey insists that dismissal is warranted because a limited liability company like 8th Street "cannot qualify as a 'consumer' under the applicable statutory scheme[s]."  Def. MTD at 8–9.  This position finds little support in the text of either statute or the relevant state and federal caselaw.

Begin with the D.C. CPPA.  That law forbids a broad array of fraudulent and unfair business practices and grants an aggrieved "consumer" the right to "bring an action" for

11

violations of its provisions. See D.C. Code §§ 28-3904, 28-3905(k)(1)(A). It defines "consumer," when invoked in noun form, as "a person who, other than for purposes of resale, does or would purchase, lease (as lessee), or receive consumer goods or services . . . or does or would otherwise provide the economic demand for a trade practice." Id. § 28-3901(a)(2). In adjective form, "consumer" is defined to include "anything, without exception" that "[a] person does or would purchase, lease (as lessee), or receive and normally use for personal, household, or family purposes." Id. § 28-3901(a)(2)(B).

Courts read these provisions in concert to suggest that a "consumer" is "a person who receives or demands goods or services that are primarily for personal, household, or family use." Shaw v. Marriott Int'l, Inc., 605 F.3d 1039, 1043 (D.C. Cir. 2010) (noting that "purpose is the touchstone of the CPPA's definition of 'consumer' and that the statute does not reach transactions intended primarily to promote business or professional interests"). Separately, the statute defines "person" as "an individual, firm, corporation, partnership, cooperative, association, or any other organization, legal entity, or group of individuals however organized." Id. § 28-3901(a)(1). The statute, on its face, would thus appear to count LLCs and other business entities as potential consumers, provided that the goods and services they acquired were for a personal, household, or family purpose.

Price v. Indep. Fed. Sav. Bank, 110 A.3d 567 (D.C. 2015) — which Defendant relies upon, see Def. MTD at 9 — does not suggest otherwise. Plaintiff Derrick Price owned a building in the District of Columbia and leased a portion of it to a limited liability company of which he was a member. Id. at 568. For months, Price was in arrears on a loan he used to refinance the property. Id. at 568–69. After the lender initiated foreclosure proceedings, Price and the LLC sued it for, *inter alia*, wrongful eviction, predatory lending, and deceptive trade

practices under the CPPA. Id. at 569. The D.C. Court of Appeals affirmed the trial court's dismissal of plaintiffs' CPPA causes of action on the ground that neither Price nor the LLC was a "consumer" within the meaning of the statute. Id. at 575. The court reached that conclusion, however, not because of the LLC's nature as an artificial entity, but because of the purposes for which the property was used. Price lived in Atlanta and leased the property to two residential tenants and to the LLC (to run its business). Ergo, its purpose was primarily commercial. Id. at 574. In rejecting the argument that "the LLC [is] a consumer because its members received a personal economic benefit," the court reasoned that any business entity would become a "consumer" were it to accept such a theory, since "income generated from business activities will always lead to a personal economic benefit for someone." Id. at 574–75 (cleaned up). The broad and simple proposition Defendant urges the Court to adopt — that LLCs can never be consumers — would have obviated much of this analysis. The Court of Appeals declined to travel down that road and this Court will do the same.

      The Maryland CPA is similar. It "addresses unfair trade practices such as misstatements or misrepresentations, made directly to the consumer[,] . . . concerning the quality and availability of goods and services or the expertise and affiliation of merchants." Boatel Indus., Inc. v. Hester, 550 A.2d 389, 302 (Md. Ct. Spec. App. 1988). And it permits the "consumer" to enforce its provisions through a civil action. See Md. Code, Com. Law § 13-401(a). Further, it defines "consumer" as "an actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit" and "consumer services" as "services which are primarily for personal, household, family, or agricultural purposes." Id. § 13-101(c)(1), (d)(1).

While corporate entities asserting claims under the CPA are usually deemed not to be "consumers," the rationale typically relies on the entities' failure to allege a personal purpose, rather than the notion that business entities are categorically barred as a matter of law from asserting such claims.  See, e.g., JFJ Toys, Inc. v. Sears Holdings Corp., 237 F. Supp. 3d 311, 342 (D. Md. 2017) (dismissing CPA claims because plaintiff corporate entity and its sole owner "have not alleged facts nor proffered any evidence that they are 'consumers'" under the purposive standard above); Alkali Sci., LLC v. Wang, No. 21-2827, 2022 WL 4484071, at *8 (D. Md. Sept. 27, 2022) (corporation "in the business . . . of buying and selling medical devices and personal protective equipment . . . . [was clearly] not a purchaser that intended to use [them] for 'personal, household, family, or agricultural purposes'");  see also JHF Vista USA, Ltd. v. John S. Connor, Inc., No. 09-30, 2010 WL 481327, at *6 (D. Md. Feb. 5, 2010) (assuming without deciding that "there are some rare circumstances under which a business might qualify as a consumer"); but see Penn-Plax, Inc. v. L. Schultz, Inc., 988 F. Supp. 906, 911 (D. Md. 1997) (concluding commercial competitors are not consumers).

The Court finds that 8th Street has sufficiently alleged that its primary purpose was to personally benefit Hannon.  Although he operated his law firm from that address, he also "resided in the apartment on the first floor" whenever he was in the District of Columbia, unlike the plaintiff in Price, and "allowed members of his family" to use it.  See Am. Compl., ¶ 11.  In addition, because 8th Street is a mere shell owned exclusively by Hannon that does not operate a business or own any assets beyond the property at issue, it has no apparent commercial purpose of its own apart from the purposes for which Hannon uses it.

14

Discovery may yet uncover new facts that swing this balance toward a predominantly commercial purpose. At this stage, however, 8th Street's allegations are enough, and Defendant's Motion to Dismiss its CPPA and CPA claims will be denied.

### D.  Other Arguments

Turnkey's remaining contentions concerning joinder and punitive damages need not detain us. Defendant suggests that dismissal is warranted under Rule 12(b)(7) because the unidentified fraudster is "the sole reason for this lawsuit" and yet is not even pseudonymously named as a party. See Def. MTD at 11. That observation may be correct, but it is also unmoored from the standards for joinder under Rule 19, which need occur only if, among other things, (1) the court "cannot accord complete relief among existing parties" without the absent party or (2) that person "claims an interest relating to the subject of the action" that may be "impair[ed]" or "leave an existing party subject to … multiple, or otherwise inconsistent obligations." The Rule "calls for a pragmatic decision based on practical considerations in the context of particular litigation." W. Flagler Assocs. v. Haaland, 71 F.4th 1059, 1071 (D.C. Cir. 2023) (citation omitted). Whether or not the fraudster is the "sole reason" for this suit, full relief can be granted here, as the action concerns Turnkey's statutory and common-law duties to 8th Street, and the alleged injury may be remedied with an award of damages. Nor does disposing of the action leave Turnkey subject to multiple or inconsistent obligations. In the event it is found liable, it may pursue a separate claim for indemnity against the fraudster. Joinder is thus not required.

Defendant's argument concerning punitive damages fares better. Such damages are unavailable for CPA violations, as a matter of law. See Hoffman v. Stamper, 867 A.2d 276, 304 (Md. App. 2005) (holding that "punitive damages may not be awarded" under CPA). To recover punitive damages for 8th Street's other claims, it "must establish that the tortious act was

15

committed with an evil motive, actual malice, deliberate violence or oppression or in support of outrageous conduct in willful disregard of another's rights." Guo Wengui v. Clark Hill, PLC, 440 F. Supp. 3d 30, 42 (D.D.C. 2020) (cleaned up); see also Beck v. Test Masters Educ. Servs. Inc., 994 F. Supp. 2d 90, 97 (D.D.C. 2013) (discussing same standard in context of CPPA). As 8th Street alleges nothing of the sort, the prayer for punitive damages shall be stricken from the Complaint.

**IV.    Conclusion**

For the foregoing reasons, the Court will grant in part and deny in part Defendant's Motion to Dismiss. A separate Order consistent with this Opinion will be issued this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: August 28, 2023